[No. 2118.]

## George Young v. The State.

1. PRACTICE — PRIVILEGE OF COUNSEL. — See the opinion *in extenso* for language employed by the State's counsel in addressing the jury *held* to be a palpable abuse of the privilege of argument, but, in view of the action of the trial court, not ground for reversal in this case. Note also the condemnation by this court of the use of inflammatory appeals by prosecuting attorneys.
2. SAME. — In order to authorize this court to revise errors predicated upon the abuse by counsel of the privilege of argument, it should be made to appear that the accused requested and was refused an instruction to the jury to disregard the unauthorized statements of the counsel.
3. CONTINUANCE. — BILL OF EXCEPTIONS is an indispensable predicate to the review by this court of the action of the trial court refusing an application for continuance.
4. MURDER — FACT CASE. — See the statement of the case for evidence *held* sufficient to support a capital conviction for murder.

APPEAL from the District Court of Ellis. Tried below before the Hon. Anson Rainey.

The death penalty was assessed against the appellant by the jury which convicted him of murder in the first degree upon an indictment which charged him with the murder of Fannie Young, in Ellis county, Texas, on the 2d day of April, 1885. The appellant and his victim were both negroes.

Mattie Henderson was the first witness for the State. She testified that the deceased, whose proper name was Fannie Henderson, was her mother. Witness's father, from whom the defendant took the deceased, was still living in Dallas county. Defendant and deceased "took up" together two or three years before the homicide, and lived together as man and wife, but were unmarried, until the death of the latter, on the 5th day of April, 1885. They lived together at the town of Palmer, in Ellis county, the deceased going under the name of Fannie Young. Just after dark on the night of April 2, 1885, while the witness was engaged in preparing supper, the defendant, having the coal sack in his hands, told witness and deceased that he was going to the depot to get some coal; that he would bring the sack of coal down the track of railroad as far as the point where some box cars were then standing, where the deceased and witness must come and get it, so that he could return to the depot. He told the witness to leave the front door slightly ajar, so that the light from the inside of the house would shine outside. He left with the sack in his hand. . After he had been gone scarcely long enough to have walked as far as the depot and back, a shot was

fired into the house, and the deceased, who, at the time was stand-
ing at the table partaking of bread and milk, fell to the floor, shot
through the head.   Witness saw no one, nor did she hear any one
about the premises, at, just before, or just after the shot was fired.
When her mother fell the witness ran, screaming, to town, and told
Mr. Hancock and others what had transpired at home.   A great
many persons soon gathered at the house, and the deceased, still
alive, was removed from the room in which she lay into another,
and the white people left in quest of the defendant.   About 11
o'clock on that night the witness found the coal sack spoken of, filled
with coal, in front of the house and near the fence, where it re-
mained until the next day.   During the night some time the defend-
ant came to the window of the house and called to some one to
bring him his coat, pencil and pocket-book.   He spoke to the wit-
ness, and asked her: "Mat., do you think I killed your mother?"
Witness replied: "I do not know, Pa, but it looks very like it, or
you would come into the house."   He replied, "Well, if you have
got that in your head, good bye."

Jim Wilson started to take the coat and pencil out of the house
to defendant, when defendant started to run.   Wilson called to
him: "Hold on; I am not after you."   Defendant then stopped,
got his coat and pencil and went off.   About two weeks before the
shooting the defendant came home drunk, got mad with the de-
ceased, burned up some of her furniture, and told her that he would
kill her if it took him twenty years.   Witness had often heard the
defendant threaten to kill the deceased.   Not many days before the
shooting the witness heard him say to the deceased:  "Fan., sup-
pose I should kill you, what do you want done with Mat.?"   De-
ceased replied that she would want Mat. (witness) to live with Mrs.
Dunlap.   Witness attended the examining trial, and there saw a
pair of socks in the possession of Mr. N. C. Evarts which, she
thought, belonged to the defendant.   They were white socks with
red tops, and were such as the witness had washed for him the day
before the shooting.   Those socks were new, and the witness washed
them for the first time on the day stated.   The defendant, on the
day of the shooting and for some time previous, wore a pair of old
boots, one of them being run down at the heel and the other having
no heel at all.   No one lived at the house in which the shooting
occurred except the defendant, the deceased and the witness.   De-
fendant was kind and considerate when sober, but very quarrelsome
when drunk.   He was sober on the day of the shooting.   He
brought a sack of flour home on that day — the first thing he had

contributed to the household since he burned the furniture up some six weeks before. He spaded up the garden on the same evening. No one save defendant, deceased and witness had been at the house on that night prior to the shooting, nor had there been any disturbance of any character. Deceased and defendant were about the same age, and the deceased was thirty-two years old at her death.

A. A. Vestal testified, for the State, that he lived at Palmer in Ellis county, and had known the defendant and the deceased since they located in that town, about two years before the shooting. They lived together as man and wife, and the witness knew the deceased only as Fannie Young. Witness heard of the shooting of Fannie Young on the night it happened, but did not go to the house until the next day. Witness went into the kitchen, which was the south room, and the room in which it was said the woman was shot, and there saw blood and brains on the floor. It was evident to witness that the fatal shot was fired through the south window. The window was such as is known as a "slide window," and the slide was open an inch or two. Witness went out to examine the outside of the window and vicinity. He found discoloration on each side of the opening of the window, left by the slide, and which he smelled and found to be powder-burn. He found the track of a man in his sock feet, about three feet from the window, the toe of the track pointing towards the window. Witness back-trailed this sock track from the window around and west of the house to the fence in front of the house, directly up to a sack of coal which lay on the ground near the fence. Witness then went back to the window and trailed the tracks the other way. From the window they went a short distance south to the corner of a gin lot, which they crossed, and passed thence over a ravine through some plowed ground towards N. C. Evarts's house. Witness trailed the tracks to Evarts's hog pen, which was about one hundred steps distant from his house. The tracks were sock tracks all the way, the threads in the sock being plainly imprinted in the mud. Three or four days after this, the witness saw the defendant crossing a field at some distance from him. Witness went and examined one of the tracks made by the defendant as he crossed the field, and then went to the gin house lot and compared the measure to one of the tracks he trailed through it on the day after the murder. He was not absolutely positive that the track he measured in the gin lot was one of the tracks he found on the trail he followed on the morning after the killing, but thought it to be. That track, however, and the track made by defendant in the field corresponded in measurement. Witness had seen the feet and

the foot-prints of the defendant, and was of opinion that the sock tracks he followed compared in size, shape and general appearance with the defendant's foot and track.  Answering a question propounded by the defense, witness said that he thought the defendant killed the deceased.

N. C. Evarts was the next witness for the State.  He testified that he lived in Palmer, and was the constable of the Palmer precinct.  He had known the defendant and the deceased as man and wife for about two years.  He knew the deceased only as Fannie Young, the name by which she was known in Palmer.  Defendant and the deceased lived in a house about three hundred yards northwest from witness's house.  The witness was at home on the night and at the time that Fannie Young was shot, but heard no report of a pistol or other weapon.  A short time after dark on that night the defendant came to witness's house and told witness that a crowd of armed men were in and about his house, creating a disturbance, and requested witness to go over there and disperse them.  Witness, thinking the defendant on a spree, told him to go home, and to send him word if the men were still there and disturbing him.  Defendant left witness's house, going towards the railroad, which was a direction opposite from his home.  Witness remarked to his wife: "That negro is not going home."  About fifteen minutes later two boys came to witness's house and told witness that Fannie Young had been shot.  Witness went immediately to the house, where he found a crowd already gathered.  The deceased, shot through the head, but still living, lay on the floor in the south room or kitchen.  Her brains were then oozing out, running on the floor.  She was taken up and removed into another room, where she died three or four days afterwards.  Search was unsuccessfully made for the defendant that night.  Witness went back to the house next morning and examined the south window of the kitchen.  The slide was pressed back far enough to make an opening about two inches in width.  Powder-burns stained each side of this opening.  The powder-burns were fresh.

Witness, with A. A. Vestal, trailed a track made by a man in his sock feet, from the window in the general direction stated by Vestal in his testimony.  This track stopped on a small moss bank within ten feet from witness's door.  The party who made the track lost a sock just after passing the witness's hog pen, from which point on a short distance the track was of a man with a sock on one foot, and the other foot bare.  The man lost his second sock a short distance from where he lost his first, and thence on the track was of a bare-

foot man. Witness looked for and found both socks, and produced them on the examining trial. They were wet and muddy when the witness got them. Witness tried them on the defendant's foot at the examining trial, and found them to fit. Witness crossed from the grass plot or moss bank to the trail on which the defendant left his, witness's, house, the night before, going towards the railroad, and found the barefoot tracks of a man which corresponded in shape, size and appearance with the barefoot track on the other side of the bank, which led to that point from the point where the last sock was lost. Witness followed that track towards the railroad to a point where the ground showed some one to have sat down. From that point on to the railroad the tracks were of a boot or shoe, the right of which was run down at the heel, and the left with no heel at all. On the day of but before the shooting occurred, the witness saw the defendant in the town of Palmer, wearing an old pair of boots, the left of which had no heel, and the right heel being run down. The old boots worn by the defendant on that day compared in shape, size, dilapidation and appearance with the tracks which witness found between his house and the railroad. The railroad was about one hundred yards from witness's house. No other than the tracks described were found on the trail between the witness's house and the railroad. No others than those described were found between the houses of the witness and the defendant, and those commenced about ten feet from where the defendant stood as he talked to witness on the night before. Defendant was unsuccessfully searched for during some five or six days before his arrest.

Jim Wilson, the next witness for the State, testified that he lived in the town of Palmer, Ellis county, three or four hundred yards north of the house in which the defendant and the deceased lived. Witness was at home when the shooting of Fannie Young occurred. Witness went to defendant's house soon after the shooting, where he remained a short time and returned home. Some time after he got home, or about 9 o'clock that night, the defendant came to his house, stopped outside at the chimney corner, and called the witness to him. Witness asked him what he was doing out there at that time of night. He replied that, *en route* home from the depot, he saw a crowd of armed men at his house and did not know what it meant, and wanted to know of the witness if anything was the matter. Witness replied that some one had shot his wife Fannie. He then asked if they accused any particular person of doing it. Witness replied that if he, defendant, did not go home they would accuse him of it. The defendant insisted on the witness going out of his

house to join him.    Witness threw his door open and started out
with a shot-gun, when the defendant ran off.    Witness then took
his wife to Fannie Young's house to sit up with her through the
night.    During the night some time defendant came to the window
of the front room and asked for his coat, pencil and pocket-book.
He called to and asked Mat. Henderson if she, Mat., thought that he
had killed the deceased      Mat. replied that she did not know, but
that, since he would n(    ,o into the house, it looked very much like
it.    He replied that since she had got that idea into her head he
would say good-bye.    Witness started towards him with his coat,
when he started to run.    Witness called to him that he was not
going to arrest him, when the defendant came up, got his things,
and left.

Em. Wilson, the wife of the last witness, testified for the State,
corroborating her husband as to what transpired at Fannie's house
after she and her husband went there to sit up.

Bob Jones testified, for the State, that he went to Palmer two or
three days after the deceased was shot, and remained over one
night.    In going across a field he met the defendant, who then had
a pistol in his hand.    At a distance of about eight feet he presented
it at the witness and ordered him to stop.    He told witness that it
would not be well for anybody to run up on him and attempt to ar-
rest him.    This occurred on a moonless night, but witness saw the
pistol distinctly.

D. Harper, testifying for the State, said that he was one of the
parties who searched for, and, after five or six days, arrested the
defendant.    Witness found him in an old cotton house, covered up,
except his head, with cotton seed.    He was suffering from a very
severe wound which was inflicted on the night before by some one
of a party which undertook to arrest him.

W. L. Hancock testified, for the State, that he lived near the
house occupied by the defendant.    He was at home when the kill-
ing occurred.    Mattie Henderson came to witness's house, screaming,
on that night, and told witness that some one had shot her mother.
Witness dispatched his boy to notify Constable Evarts, but, being a
cripple, did not go to the house himself.    About three weeks before
the shooting, the defendant got drunk, went home and got mad
with the deceased, created a disturbance and burned up some furni-
ture.    He was prosecuted and fined, and worked out his fine on the
street.    The witness afterwards, in talking to him about his con-
duct, told him that if he did not mend his ways he would get his
neck broken or break into the penitentiary.    He replied that he did

not care a d—n; that if the deceased had not reported him he would not have been punished; that the witness need not be surprised to hear at any time that h—ll had been raised at his house. The defendant was not drunk when that conversation took place, but was drunk the night before. On another occasion the witness heard violent quarreling at defendant's house. Some one, witness did not know who, hallooed to witness to come down there or a negro would be killed. The defendant and the deceased at that time were standing in their yard.

Deputy Sheriff Will McCue testified, for the State, that his searching party ran upon the defendant in the brush near Palmer on the night before his arrest in the cotton house, and witness called to defendant to halt. Defendant threw his hand behind him and ran, and some one of the party fired on him.

The defense offering no testimony, the case closed.

The motion for new trial raised the questions discussed in the opinion.

No brief for appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

HURT, JUDGE. George Young was tried and convicted of murder of the first degree for the killing of Fannie Young, the death penalty being assessed by the jury.

Two bills of exceptions appear in the record. 1st. It appears that F. M. Maxwell remarked to the jury in the opening argument: "Gentlemen, in the back part of this court room sit a number of negroes, who are watching this trial to see if you will punish a negro for murdering his wife. If you don't convict this negro, people will not bring them to trial hereafter, but will hang them on the spot where the crime is committed. If you turn this man loose, then it is impossible to convict a man on circumstantial evidence, for it is plainer than any case reported. Gentlemen of the jury, look at the defendant; there he sits; can you not see the demon in his eyes? does not his countenance declare him a murderer? Gentlemen, the welfare and peace of society depend upon your convicting this man. If you turn him loose you encourage mob law." When the court's attention was called to these remarks, counsel for the State, Mr. Maxwell, did not indulge further in these or similar, but closed his argument.

That these remarks were altogether improper cannot be ques-

tioned, and it is passing strange to us that counsel for the prosecution will indulge in such, especially after such conduct has so often received at the hands of this court such stern rebuke. Is it not possible to convict the guilty alone upon the law and the evidence? Would any member of the legal profession be willing to be tried by more or less; would he be willing that the humblest citizen of this proud State should be tried in any other manner save upon the law and the facts in the case? Then, why will counsel leave the record and drag into the case matters wholly foreign, and which are frequently very unjust and oppressive to the accused?

Now, in relation to this matter, we would be inclined to reverse the judgment if counsel for appellant had called upon the court to repress counsel for the State, and this had been refused, and such conduct had been persisted in without reproof. But it seems that when the attention of the court was called to these remarks, Mr. F. M. Maxwell closed his argument.

Again, if counsel for defendant had requested the court to instruct the jury that they should not be influenced by any such argument,— if such remarks could be dignified as such,— and the court had refused, we think an error would have been committed such as would have required a reversal of the judgment. This, however, was not done.

The second bill of exceptions informs us that the county attorney, Mr. Templeton, at the close of his argument said to the jury: "Gentlemen, I believe that George Young is guilty of this atrocious murder. I am not opposed to capital punishment, and believing him guilty, I would have the nerve to hang him." Counsel for defendant excepted to said remarks and did nothing else. While it is true that authors in treating upon this subject say that counsel either for or against the prisoner should never express their opinion as to the guilt or innocence of the accused, yet we would hesitate at this day to reverse a judgment because of a violation of this rule. But here again counsel for defendant should have requested the court to instruct the jury that they should not be influenced by Mr. Templeton's opinion as to defendant's guilt.

A motion for new trial was made, based upon two grounds: 2d. The matters already noticed, to wit, remarks of counsel for the prosecution; and 1st. That the evidence is not sufficient to support the verdict and judgment. We will not discuss the evidence, but must say that in our opinion it is conclusive of his guilt; not only so, but that defendant was guilty of murder of the first degree there cannot be the least doubt.

His wife, or the woman with whom he was living, was in the house. Appellant, at night, left the house for the avowed purpose of getting a sack of coal, telling the girl Mattie Henderson, and Fannie Young, deceased, to come to the depot after a while to get the coal; that he was going to get some coal from the depot. Shortly after defendant left, Fannie, while standing at the end of the dining table eating milk and bread, was shot through the head from the south window, the slide of which was pulled back a little, leaving an opening an inch or so wide. The girl gave the alarm and the neighbors gathered at once at the place of the homicide. That night defendant came to the front window and called for some one to bring his coat, pants and pocket-book to him; and while at the window, defendant asked the girl if she thought he killed her mother. She replied that she did not know, " but it looked like it or you would come into the house; " whereupon defendant said, " if you have that in your head, good-bye," and left.

These are merely some of the facts establishing the guilt of the appellant, but by no means all, there being a solid chain of irrefragable facts tending unerringly to the guilt of defendant. In fact, when viewed separately, or taken together, the circumstances are of such a nature as to exclude absolutely any other conclusion save that of the guilt of defendant. It is a case, if the witnesses swear the truth, and of this we have no reason for doubt, in which the mind can rest at ease in its belief of the guilt of the accused.

There was a motion for continuance which was overruled, but the record does not contain a bill of exceptions thereto. We will not revise the action of the court relating to this matter in the absence of a bill of exceptions.

We have not had the benefit of a brief or argument for appellant, to assist us in properly disposing of this appeal, but we have given this record our most careful consideration, concluding that, if there be error, we have failed to discover in what particular,— such error as would authorize a reversal of the judgment. The judgment is affirmed.

*Affirmed.*

[Opinion delivered December 9, 1885.]